UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
NICOLE ADIRAM, et al.,

                          Plaintiffs,

  -against-

CATHOLIC GUARDIAN SERVICES f/k/a
CATHOLIC GUARDIAN SOCIETY
AND HOME BUREAU,

                          Defendant.
-----------------------------------------------------------------x

**MEMORANDUM & ORDER**

13-CV-6235 (SLT)(JO)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ SEP 28 2015 ★
BROOKLYN OFFICE

**TOWNES, United States District Judge:**

Plaintiffs filed their Amended Complaint on April 10, 2014, alleging, among other things, violations of the False Claims Act's anti-retaliation provision, 31 U.S.C. § 3730(h). These claims arise from complaints Plaintiffs made against their employer, Defendant Catholic Guardian Services. On September 12, 2014, Defendant moved this Court to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. (ECF No. 20.) For the reasons set forth below, Defendant's Motion is granted.

## I. BACKGROUND

### A. Factual Background

Plaintiffs Nicole Adiram, Alliyah Cannonier, Donna Edwards, Shirley Griffith, Ruth Hopkins, and Zulay Roman (collectively, "Plaintiffs") are or were employees of Defendant Catholic Guardian Services ("CGS"), a not-for-profit corporation that provides residential services for people with developmental disabilities. (Am. Compl. ¶¶ 9–10, ECF No. 14.) CGS has sought and received funding from the federal government and New York State. (*Id.* ¶ 14.)

Starting in January 2013 and continuing throughout that year, Adiram, Cannonier, and Roman notified CGS management "of various health and safety issues along with fraudulent

practices." (*Id.* ¶ 16.) Specifically, they raised "the lack of food for residents"; "the apparent funding shortfalls in the [food] budget"; "the lack of [funding and] petty cash" to cover "transportation . . . and recreational activities"; "the lack of training . . . and . . . security"; and "the apparent falsification of documents, revealing, for instance, that [CGS] submitted invoices to [and received payment from] the federal and New York State governments for payment for services that were not actually provided to [CGS]'s residents." (*Id.*)

CGS did not take corrective action in response to these complaints, so Plaintiffs spent their own money to provide food and transportation to residents. (*Id.* ¶ 18.) Adiram and Roman subsequently "complained to various oversight organizations, including but not limited to the New York State Justice Center for the Protection of People with Special Needs; the Occupational Health and Safety Administration; the New York State Office of Mental Health; and the Office for Persons with Developmental Disabilities."[1] (*Id.* ¶ 19.)

Once CGS management became aware of the complaints, CGS "began to threaten and harass all the Plaintiffs because some had reported their concerns." (*Id.* ¶ 22.) CGS did not know who had contacted the outside organizations but "repeatedly told Plaintiffs that they would face negative consequences if any of them complained to an oversight agency." (*Id.* ¶¶ 20, 37.) In July 2013, a CGS manager told some of the Plaintiffs that "staff will [be fired] the next time the State is contacted." (*Id.* ¶ 23.) On August 11, 2013, another manager told Plaintiffs "that they would regret it the 'next time the State is called.'" (*Id.* ¶ 24.) In late August, a manager asked Plaintiffs who had "called the State to say we have no food," and told them that "staff will lose their jobs" if Plaintiffs "keep calling the State." (*Id.* ¶ 25.)

---

[1] The Amended Complaint does not identify the other organizations to which Plaintiffs complained.

-2-

After CGS learned of the Plaintiffs' complaints, the Plaintiffs were terminated, suspended, or forced to resign. CGS terminated Adiram's employment on September 20, 2013, for "allegedly removing confidential documents" from work. (*Id.* ¶ 28.) CGS suspended Cannonier on August 28, 2013, for "allegedly being in possession of marijuana" at work. (*Id.* ¶ 27.) CGS suspended Edwards and Griffith on September 25, 2013, for "an alleged incident of abuse or neglect" and transferred the two to work at a different location. (*Id.* ¶¶ 29–30.) CGS suspended Hopkins on September 25, 2013, for "allegedly failing to document the dispensing of medication to residents," and she subsequently resigned. (*Id.* ¶ 31.) Roman resigned on October 8, 2013, after CGS's refusal to send a replacement for a sick co-worker left Roman alone for an overnight shift, causing her to suffer a panic attack. (*Id.* ¶ 32.)

### B. Procedural History

Plaintiffs filed their original Complaint on November 12, 2013, alleging retaliation and overtime claims under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and New York Labor Law, NYLL §§ 160 *et seq.* (ECF No. 1.) Before CGS answered, Plaintiffs filed an Amended Complaint adding factual allegations and a New York Labor Law wage claim. (ECF No. 14.) In April 2014, CGS filed a pre-motion conference request seeking leave to move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 15.) Plaintiffs filed a response, (ECF No. 16), and this Court granted CGS leave to file its motion in May 2014, (Order dated May 20, 2014).

CGS filed its Motion to Dismiss all of Plaintiffs' claims in September 2014. (ECF No. 20.) In their Memorandum in Opposition, Plaintiffs voluntarily withdrew their New York Labor Law Claims without prejudice. (Mem. Opp. 1 n.1, ECF No. 22.) Thus, this Court need only

decide whether the Amended Complaint adequately states a claim for retaliation pursuant to the False Claims Act.

## II. LEGAL STANDARD

To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must state a claim for relief that is "plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007). The complaint must plead factual content which "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). At this stage, the Court must "accept the complaint's factual allegations, and all reasonable inferences that can be drawn from those allegations in the plaintiff's favor, as true." *Roth v. Jennings*, 489 F.3d 499, 501 (2d Cir. 2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted).

At this stage, the Court's inquiry is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996) (citation and internal quotation marks omitted). "Dismissal is appropriate only where it appears beyond doubt that a plaintiff can prove no set of facts in support of her claim that would entitle her to relief." *State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F. Supp. 2d 94, 98 (E.D.N.Y. 2010) (citation omitted). Because Plaintiffs allege retaliation claims only, Rule 9(b)'s heightened pleading standard does not apply. *See United States ex rel. Klein v. Empire Educ. Corp.*, 959 F. Supp. 2d 248, 256 n.2 (N.D.N.Y. 2013) (citation omitted).

## III. DISCUSSION

The False Claims Act ("FCA") prohibits the submission of false or fraudulent claims for payment to the United States. 31 U.S.C. § 3729. The FCA permits private individuals who are

aware of a perpetrated fraud to "bring a civil action . . . for the person and for the United States Government." 31 U.S.C. § 3730(b). To protect whistleblowers and "'encourage any individuals knowing of Government fraud to bring that information forward,'" the FCA includes an anti-retaliation provision. *McAllan v. Von Essen*, 517 F. Supp. 2d 672, 685 (S.D.N.Y. 2007) (citing S. Rep. No. 99-345, at *2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5266–67); *see also Garcia v. Aspira of N.Y., Inc.*, 2011 WL 1458155, *3 (S.D.N.Y. Apr. 13, 2011) ("This whistleblower provision was intended to protect persons who assist in the discovery and prosecution of fraud, because few individuals will expose fraud if they fear their disclosures will lead to harassment, demotion, loss of employment or any other form of retaliation." (internal citations and quotation marks omitted)). The FCA's whistleblower provision thus provides make-whole relief to any employee who is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . or associated others in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of [the FCA]." *See* 31 U.S.C. § 3730(h).

To sustain a claim under the FCA's anti-retaliation provision, a plaintiff must establish that: "(1) the employee engaged in conduct protected under the FCA; (2) the employer knew that the employee was engaged in such conduct; and (3) the employer discharged, discriminated against or otherwise retaliated against the employee because of the protected conduct." *United States ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 102 (D. Conn. 2006) (citations omitted). CGS argues that Plaintiffs' Amended Complaint does not adequately plead any of these three prongs and thus does not state a plausible claim for relief.

## A. Protected Conduct

### *1. Adiram, Cannonier, and Roman*

In evaluating a complaint's allegations of protected conduct, courts within the Second Circuit have emphasized the "in furtherance of" language of the statute itself.[2] Thus, a plaintiff must demonstrate that her activities "were directed at exposing a fraud upon the government." *See Moor-Jankowski v. Bd. of Trustees of New York Univ.*, No. 96 CIV. 5997(JFK), 1998 WL 474084, at *10 (S.D.N.Y. Aug. 10, 1998) (citation and internal quotation marks omitted). "Generally, when a potential plaintiff engages in an investigation in which it would be reasonable to conclude that there is a 'distinct possibility' that he or she would find evidence of a FCA violation, courts are inclined to find that the first prong of the analysis has been satisfied." *Smith*, 415 F. Supp. 2d at 103 (citation omitted). Although a plaintiff need not prevail on—or even file—underlying fraud claims, *see Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 416 n.1 (2005), she must have a "good faith basis, or objectively reasonable basis, for believing that . . . she was investigating matters in support of a viable FCA case," *United States ex rel. Moore v. Cmty. Health Servs., Inc.*, No. 3:09CV1127 (JBA), 2012 WL 1069474, at *8 (D. Conn. Mar. 29, 2012) (citations and internal quotation marks omitted). "Although the types of activities covered are broad, the employee's purpose must not be detached from the [FCA] in order for the employee to receive the FCA's whistle

---

[2] The Fraud Enforcement and Recovery Act of 2009 ("FERA") expanded the FCA's whistleblower protections also to include "other efforts to stop . . . violations of [the FCA]." 31 U.S.C. § 3730(h)(1); Pub. L. No. 111–21, § 4, 123 Stat. 1617, 1624–25 (2009); *see also Weslowski v. Zugibe*, 14 F. Supp. 3d 295, 310–11 (S.D.N.Y. 2014) (internal citations omitted). These "other efforts" include, for example, "reporting suspected misconduct to internal supervisors." *Halasa v. ITT Educ. Servs.*, 690 F.3d 844, 847–48 (7th Cir. 2012). Although FERA expanded the scope of the FCA's whistleblower provision, an employee's activity must still be aimed at "violations of [the FCA]." *See* 31 U.S.C. § 3730(h)(1).

blower protections." *Garcia*, 2011 WL 1458155, at *4 (citation and internal quotation marks omitted). The following cases illustrate this distinction.

In *Smith*, the plaintiff, a medical doctor working at Yale University and Yale-New Haven Hospital, brought fraud and retaliation claims alleging that the defendants violated the FCA "by falsely billing and retaining payments from the Medicare and Medicaid Programs for certain radiological services." 415 F. Supp. 2d at 63. The plaintiff's complaint detailed a scheme whereby the defendants falsified and altered patient records and falsely certified that certain reimbursement requirements had been met for thousands of radiological tests. *Id.* at 63–65. For example, the plaintiff alleged that the defendants used an "Autosign" function "to reflect a fictitious qualified 'Responsible Radiologist' of record for the purpose of finalizing radiology reports which were dictated by [Yale-New Haven Hospital]'s radiology Residents and Fellows but were never reviewed, approved, edited or certified by the Residents' or Fellows' Teaching Physician as required pursuant to the Medicare laws." *Id.* at 64–65. The complaint further alleged that the plaintiff had "met with Representatives from the Department of Justice several times" and "outlined Defendant's practices which resulted in the submission of false claims to Medicare." *Id.* at 66. He further alleged that he had met with Yale's President and General Counsel "to discuss what [he] perceived to be fraudulent activity." *Id.* The court found that these details "properly allege[d] that [plaintiff's] investigations and reports concerned activities that allegedly involved fraud on the government" and thus "satisfie[d] the first prong of the Section 3730(h) inquiry." *Id.* at 104.

In *Garcia*, the plaintiff worked as the Assistant Director of Programs for defendant Aspira, a not-for-profit corporation that operated publicly-funded after-school and youth programs, but was fired after complaining about submissions of false claims to the government.

2011 WL 1458155, at *1. The plaintiff alleged that Aspira had misused government funds by "falsely claim[ing] that services, such as assistance with college admissions and financial aid applications, were performed when they were not, and . . . list[ing] students as enrolled and receiving . . . services when they were not." *Id.* He also alleged that Aspira used government funds for expenses and equipment not actually used by the programs receiving the funds. *Id.* at *2. After investigating, the plaintiff complained at a budget meeting to Aspira's Executive Director and CFO, "citing specific examples of the alleged fraudulent conduct." *Id.* at *4. He then tried to get a managing director to schedule a meeting with the Executive Director and CFO because he "had documents demonstrating [the budget discrepancies] and knew enough about the fraud to take his complaints to the authorities." *Id.* (alteration in original). Under these facts, the court found that "plaintiff's observations and his confrontations with defendant establish[ed] that he ha[d] engaged in protected conduct." *Id.*

On the other hand, courts will grant a motion to dismiss where the plaintiff's complaint does not allege any FCA-related inquiry or conduct. The plaintiff in *Moor-Jankowski* was the former director of the Laboratory for Experimental Medicine and Surgery, which was then affiliated with New York University ("NYU"). 1998 WL 474084, at *1. The plaintiff complained about an NYU researcher to the United States Department of Agriculture ("USDA"), which is "the agency responsible for administering and enforcing the Animal Welfare Act," and to the Institutional Animal Care and Use Committees, which is "an oversight committee at the institution [that] acts to ensure that USDA rules and regulations with regard to animal care are properly observed." *Id.* at *1–2, 12. Specifically, the plaintiff argued that the researcher "conducted government-funded experiments on monkeys under conditions so violative of the [Animal Welfare Act], that these scientific experiments constituted a 'fraud.'" *Id.* at *12.

Plaintiff's concerns included "excessive water deprivation, inhumane conditions used in transporting the monkeys, and botched surgeries." *Id.* The plaintiff thus argued that the defendants were "wasting $500,000 a year in taxpayer money on that fraudulent research." *Id.* The court found, however, that "[t]he Complaint [made] clear that exposing a fraud upon the government within the meaning of the FCA was not [the plaintiff's] motivation in protesting the treatment of the monkeys used in [NYU's] research." *Id.* Rather, the plaintiff's activities were "aimed only at getting NYUMC to bring all research at NYUMC facilities into compliance with the [Animal Welfare Act]." *Id.* Because the complaint lacked any well-pleaded allegations to connect these activities to any financial fraud, the court found that the plaintiff had not pleaded any protected activity. *Id.*

This case most closely resembles *Moor-Jankowski*. Here, Plaintiffs were apparently motivated by concerns about the health and safety of their residents, not by financial fraud. Adiram, Cannonier, and Roman allege that they complained to CGS and the New York State Justice Center for the Protection of People with Special Needs, the Occupational Health and Safety Administration, the New York State Office of Mental Health, and the Office for Persons with Developmental Disabilities about "health and safety issues," including "the lack of food for residents"; the insufficient food budget; "the lack of [funding and] petty cash to pay for such items as residents' transportation to therapeutic and recreational activities"; and the lack of security and training to "manage violent and aggressive residents and provide a safe environment." (Am. Compl. ¶¶ 16, 19.) While serious, Plaintiffs do not connect these allegations to any false claims presented to the government.

Unlike the plaintiffs in *Smith* and *Garcia*, Plaintiffs here provide no details regarding the alleged fraud. Rather, Plaintiffs allege, without further explanation, that Defendant has engaged

in "the apparent falsification of documents, revealing, for instance, that Defendant submitted invoices to the federal and New York State governments for payment for services that were not actually provided to Defendant's residents." (*Id.* at ¶ 16.) Conclusory allegations such as this do not support an inference that Plaintiffs were engaged in any conduct "in furtherance of an action under [the FCA] or other efforts to stop" a violation of the FCA. *See* 31 U.S.C. § 3730(h). Because Plaintiffs' well-pleaded allegations concern only health and safety, and not fraud against the government, Plaintiffs have not "nudged their claims across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570.

### 2. *Edwards, Griffith, and Hopkins*

CGS also argues that Edwards, Griffith, and Hopkins's retaliation claims fail because the Amended Complaint does not allege that they personally engaged in any protected conduct. (Mem. Supp. 4, ECF No. 21.) Plaintiffs respond that whether Edwards, Griffith, and Hopkins actually engaged in protected conduct is irrelevant because CGS retaliated against *all* of the Plaintiffs. (Mem. Opp. 7, ECF No. 22.) Plaintiffs argue that "[i]t would be antithetical to the FCA's anti-retaliatory provision, and extremely chilling to the exercise of the FCA, if an employer could retaliate with impunity against any employee who it wrongly believes may have engaged in protected activity, or who is associated with an employee who may have engaged in protected activity." (*Id.*)

The post-FERA version of the FCA appears to recognize "associational" retaliation claims. *See* 31 U.S.C. § 3730(h)(1) (prohibiting retaliation "because of lawful acts done by the employee, contractor, agent *or associated others* in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of [the FCA]" (emphasis added)); *Aryai v. Forfeiture Support Assocs.*, 25 F. Supp. 3d 376, 386 (S.D.N.Y. 2012) ("According to the House Report,

Congress intended for the amendment to 'broaden protections for whistleblowers by expanding the [FCA]'s anti-retaliation provision to cover any retaliation against those who planned to file an action (but did not), *people related to or associated with relators*, and contract workers and others who are not technically "employees."'" (emphasis added) (citing H.R.Rep. No. 111–97, at 14 (2009))). Assuming that the FCA recognizes such claims, § 3730(h)(1) nonetheless requires sufficient FCA-directed conduct to trigger the FCA's anti-retaliation protections. *See* 31 U.S.C. § 3730(h)(1). As discussed above, Plaintiffs have not pleaded sufficient FCA-directed conduct to trigger these protections.

### B. Alternative Arguments

Because the Amended Complaint fails for the independent reason that it does not adequately plead protected conduct, this Court need not address Defendant's alternative arguments that the Amended Complaint also fails sufficiently to plead the notice and causation prongs of a § 3730(h) retaliation claim.

### IV. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss (ECF No. 20) is granted. Plaintiffs have requested leave to re-plead. (*See* Mem. Opp. 11, ECF No. 22.) Because re-pleading could cure the deficiencies noted herein, the Court will permit Plaintiffs to file a Second Amended Complaint within 30 days of entry of this Memorandum and Order.

**SO ORDERED.**

/s/ Sandra L. Townes
/SANDRA L. TOWNES
United States District Judge

Dated: September 23, 2015
Brooklyn, New York